Arthrex Medical Corporation v. Arthrex Incorporated Arthrex Corporation v. Arthrex Corporation v. Arthrex Corporation I'd like to spend my time this morning talking about two of the grounds that require reversal in this case that were in our brief. The first being obviousness and then the second being the claim construction issue relating to underneath the tissue. I want to start with obviousness because this case is exactly the kind of case that KSR has told us in which obviousness is appropriate as a matter of law. What we have here is no more than a combination of known elements according to known methods that does no more than yield predictable results. Just like in KSR, there really is no debate that nearly every limitation of KFx's claims can be found in one prior art reference and that's the prior art technique by Dr. Peter Millett. But Dr. Millett's work involved corkscrew anchors that required tying knots on the lateral anchor. So it did not teach that the first length of suture is secured to the second anchor without tying knots. But KFx does not dispute that Greenfield teaches exactly that kind of anchor. It's a knotless anchor that can be used in the place of the anchors in Dr. Millett's procedure. Their only argument is that a person of ordinary skill in the art would not have known to go into the Greenfield patent reference specifically from other knotless anchors that were known. But on that critical issue, the evidence shows definitively that there is motivation and there's simply nothing to support the jury's conclusion otherwise. Our brief contains many of the sites that make clear that the intended purpose of Greenfield is to tension the suture after the anchor is inserted, just as in the KFx's invention, and that that will provide benefits for rotator cuff repair. What Greenfield discloses is a question of fact, right? What Greenfield discloses is a question of fact. That's correct. So we would have to conclude that the jury's potential conclusion that Greenfield did not provide the motivation you're suggesting it does is not supported by substantial evidence in order to go with you. I think with respect to the fact finding that that's correct. We have to look to whether or not there is substantial evidence. But obviously with respect to the overall question of whether or not the... Did Dr. Ticker testify, he's KFx's expert expressly on this point, that couldn't that provide the substantial evidence for the jury verdict? That's exactly where the district court went wrong. Dr. Ticker did no such thing. All that Dr. Ticker said is, there's nothing out there. But with respect to Greenfield, he was absolutely silent. The only thing that he said with respect to Greenfield was that he had no opinion as to whether or not it would be appropriate to combine Greenfield with Millett. He then went to Dr. Millett's teaching and said, I find nothing there that provides the motivation. And then he went on to two other patent references that were discussed in the prosecution history that didn't show tensioning after insertion. But with respect to the Greenfield patent teachings, and these motivations, they're found in our... Why isn't the jury allowed to rely on this negative evidence of the expert that he doesn't know, he can't establish any reason to combine with Greenfield to make a finding that there's no motivation to combine with Greenfield? Because it's the type of evidence that this court has rejected in any number of occasions and KSR... That it's not your burden to show motivation to combine, it's their burden to show that there is no motivation to combine. But I believe that we came forward with the motivation. We came forward with the Greenfield reference. We came forward... But the jury disagreed with you. But we also came forward with the fact that... And they don't dispute this, that upon seeing... I understand that, but you're saying, essentially, that once you provide a motivation to combine, that they have to disprove a motivation to combine overwhelmingly, or something like that. I mean, the jury clearly disagreed with you. And so you're pointing to evidence showing motivation to combine doesn't really help you, because clearly you pointed to evidence that they rejected. But again, this court has to consider this all again de novo. So it can't... No, we don't. The motivation to combine is a factual question, isn't it? But it has to look to the obviousness. And I think that in the number of cases... That's the only thing we're talking about here. I agree with you. Everything else seems to be there. All the conclusions, all the limitations seem to be in these two references. But if we don't have a factual motivation to combine, we still lose, right? But I think that there's no substantial evidence to support that in light of the teachings of Greenfield. I think that the motivation is clearly there. And I think that all KFX has is a conclusory statement of its expert, which says nothing at all about Greenfield. And so there's just simply no substantial evidence to support a finding that there's no motivation to combine in light of Greenfield itself. And also in light of one other thing, which is, as this court said in a number of occasions, most recently last month in an opinion that you, Judge Hughes, were a part of in the Parr case, the motivation doesn't have to be the same motivation that motivated the inventors. And so here, there's no dispute that upon seeing Millett's work, the entire orthopedic community understood this is terrific in terms of compressing the tissue to bone, but it needs to be knotless. They understood that. Dr. Ellitrass testified that way. Dr. Greenleaf testified that way. And it was actually part of KFX's presentation about how difficult knot tying was. So just the fact that Greenfield teaches you exactly that type of anchor that you're going to be looking for, a knotless anchor, and its intended purpose, Greenfield actually refers to this as a preferred characteristic of its anchor is that it's going to be able to tension after insertion. So that, too, is enough. It provides exactly the type of motivation, even under a pre-KSR case law that was required, and certainly in the more flexible context post-KSR, we believe that we've far exceeded the clear and convincing evidence standard. I'd like to turn now to our second point, which is with respect to underneath the tissue and the claim construction issue. Here, Arthrex's construction is that this claim requires inserting the first anchor underneath the tissue. We believe that this is wholly and completely consistent with the plain language of the claim itself. The where in clause, where the location is found, it's part of the inserting step. It's within a particular claim limitation. It's part of the inserting step, and that's exactly how we're interpreting it. KFX argues that we're adding a timing limitation to the claim, but that's simply not true. The limitation itself puts this position as a descriptor of the inserting step. If anyone's adding unnatural claim language to the construction, it's actually KFX. I don't understand your dispute right now when you're saying you're not adding a timing limitation. It seems like nonsense to me. You are adding a timing limitation. Your argument is that the where in has to be done during the step of inserting. You're saying that the where in clause is linked to the insertion, and so I don't see... What I'm saying is I'm not adding anything because the claim requires it itself. It requires that this location be met at the time of inserting, so the temporal limitation is already there. I'm just simply saying that we're not adding. You're not disputing that there is a temporal limitation under your construction. You're saying that the claim element expressly requires it. That's exactly right. What's the definition of where in? I did look this up, and I can't recall right now. Is it an adverb or a conjunction? Because where in can be either an adverb or a conjunction. I don't know. Well, in this case, look at it. Is it an adverb or a conjunction? Because it matches up to the definition. Then it would be an adverb because it is relating to the verb. That's an unfortunate choice by you. Because according to Merriam-Webster, the adverb where in means in what way or in what. However, the conjunction definition of where in means during which. During which, it seems to me, would exactly implicate the kind of timing that your suggestion applies. But you just told me it was an adverb. Well, I told you it was an adverb. Just going back to my 7th grade grammar, trying to remember what... Do you remember which one it is? I certainly believe that that second definition is completely consistent with how this is used within the claim, how it's used within the spec, and how it's used within the rest of the intrinsic matter. Let me reconsider your grammar point. My dictionary tells me that where in as a conjunction can mean both during or a location. Is there anything else in the claim language that would suggest one thing or the other? In terms of, could you tell me... Whether it's during or where. So I think that, but it's both. It's both during and where. I have another question that I don't want to parse grammar. I know that that makes much difference to me here. Is there a way that you can insert this under the skin without going through the tendon if we accept your claim construction? I believe hypothetically there probably would be. I mean, you could simply lift the tissue straight up as opposed to what Arthrex teaches, which is that you not only lift it up, you're actually pushing it all the way back. You're then cleaning that area of the bone. So if you simply lifted it up, you'd actually get the benefit of not further injuring the tissue by pulling it back. And you'd also be able to better see the spot where you're inserting, which is a big problem in rotator cuff repairs, is that you're trying to do this blind if you do it other ways, such as through the tissue. So if you lifted it straight up, put the anchor directly underneath where that tissue is, you would meet that limitation because you'd be under at the time of inserting. Because the tissue is hovering above it in the air? Because you're under the place where the tissue is. But you're not because the tissue is not – unless you're just talking about hovering under. What if they pick the tissue up and then for – I don't know how flexible or non-flexible they are, but in order to make it easier to insert, they fold it back and lay it down, and then they insert, and then they just put it back. Is that under the skin? Under the tissue? It wouldn't be at the time that you're inserting. So your view is the only way for it to be under and not go through is if they actually hold it in the air and then somehow come in underneath. Right, and I don't think that that's too far-fetched again because of the issue with inserting it blindly. I want to go back for a second. So if there are two possible plain meanings of wherein, one is where, which would favor them, and one is during which, which would favor your position, how do courts generally choose from among two possible plain meanings which one to adopt in a given case? So I think that – I want to have a couple of answers to that. Obviously, Phillips teaches us that the very best source to answer that question is to go to specification. And here, as we laid out extensively in our brief, every time where inserting the medial anchor is described, it's always described as being underneath the tissue at the time of insertion. Well, it's always described as going through the tissue, quite frankly, isn't it? I mean, is there any example provided where it doesn't go through the tissue in the specification? So in column 14, it just says, in one embodiment, the first anchor is positioned beneath the soft tissue. I guess that actually doesn't get into doing it another way, as Judge Hughes was suggesting. So I don't know that it gives you another example of doing anything other than going through the tissue, to be underneath the tissue when it's inserted. So doesn't your answer have to be that as a claim limitation on either grammatical construction, one looks to see whether that limitation is met? It is, I think, part of the grammar. So I'd actually like to point this court to another case where I think exactly this question was raised, and that's Cradle v. Bond, and that's at 25F3rd, 1566. And this court was considering whether or not a part of a phrase was part and parcel of one method step, or whether or not it constituted a separate method step on its own. And the court relied on exactly this. It relied on the grammar, and it relied on the punctuation. But are you raising the issue as to how that was presented to the jury for definition and decision? No, we're not challenging a jury finding at all with respect to this. We're simply challenging the claim construction as the district court found it at summary judgment. And so there is no dispute on appeal as to how it would play out if the claim construction is reversed. Can I just ask you to re-explain to me what you said about Column 14, because I'm not sure I agree that this presents simply beneath the soft tissue rather than through. So explain which words you were relying on. No, I ultimately conceded that that was correct, that as Judge Hughes pointed out, there's nothing else in the patent that teaches anything other than going through the tissue to be under the tissue. But there's also no teaching of inserting the first anchor anywhere other than underneath the tissue. And I'd also like to point to one other part of the prosecution history that I think is reflective of that and tells you exactly what it is that the inventors captioned within this claim. And that's at A11264 and 11266. This is after there was a rejection, a summary of an examiner interview that was conducted. And they said, applicants pointed out that none of the cited are disclosed inserting a first anchor underneath soft tissue and a second anchor beyond an edge of the tissue. So here we're not challenged with the wearing clause. In describing this invention, the invention that's ultimately claimed in Claim 1 of the 311 patent, they didn't use the wearing clause. So I don't know that we need to go to the grammar of whether it's an adjective or an adverb. They simply said that what this claim teaches is inserting a first anchor underneath soft tissue. And for all the reasons that we discussed here today and pointed out in our brief, we believe that that construction should control. Okay. Thank you. Mr. Drew, if I could save you a couple of minutes. Thank you, Your Honor. Mr. Jennings. Good morning, Your Honors. May it please the Court. I'll address the two issues my friend addressed on this appeal. First, with respect to obviousness, substantial evidence supports the jury's implicit finding that there was no reason or motivation to combine the references here. First, Dr. Ticker testified explicitly as to the contingent motivation of going knotless. And he said, that motivation does not lead you to the invention here. There are many anchors that you could go to that would give you a knotless construct and it doesn't. You're asking for an inference or was the jury presented with that specific question of motivation to combine? The jury was not given that specific question. The jury was given the verdict on obviousness. And so in reviewing a verdict on obviousness, this Court looks to the underlying factual disputes and leaves undisturbed those that are supported by substantial evidence. And the motivation to combine is a factual issue as this Court has recognized. And it was disputed at trial. And there was substantial evidence to support an implicit finding in the patent owner's favor here on that issue. Dr. Ticker testified explicitly that a reason to go knotless was not a motivation here. It would not lead one to the invention. And very significantly, in supporting the evidence that supports that opinion, Arthrex, when it went to improve Dr. Millett's work, went the wrong way. They went with their biotinodesis anchor, which was a one-piece anchor that did not permit one to use that anchor, insert the anchor, then tension the sutures that are coming from the medial anchor out to that second lateral anchor to get that tension and the compression on the area of the soft tissue exactly right. The biotinodesis anchor did not permit one to practice the invention that KFX patented. And Arthrex here went in that direction for several years, attempting to get the biotinodesis anchor to work. So they're going in the wrong way, which further supports Dr. Ticker's testimony that there was not a motivation under the facts here. And they ultimately had problems even getting that biotinodesis anchor to work in a knotless fashion. And then they went in a different direction, and they turned to an anchor that would permit them to practice the invention that's patented by KFX. And that's years later. And even then, when they had an anchor that would permit them to practice that invention, they initially suggested the use of the technique without using the option of adjusting the tension after the anchor was inserted, but rather getting the tension first and then putting the anchor in. And if it wasn't right, pulling the anchor out again, readjusting, and going back in. And that was the technique guides, which were on our red brief, and we contrasted Exhibit 76 trial, which was a first version, and then Exhibit 80, which was a second version, which was years after KFX's invention, when they ultimately appreciated the significance of this step. And Mr. Sudeikis, the product manager, added that to the technique at the suggestion of Dr. Guerra, who had suggested it to him. And Mr. Sudeikis explained in his testimony that it was interesting because he had never seen it done before. Arthrex also relies upon KFX on patents as grounds in their briefs for a motivation to combine. And that is hindsight, which is unacceptable. Dr. Greenleaf, the expert. Why don't you turn to the infringement question, and in particular the wear-in clause, and whether or not the anchor has to be beneath the soft tissue at the time of insertion, during the insertion. Certainly, Your Honor. If the plain meaning of wear-in could include either of two things, wear or during which. During which would imply the temporal, I mean, I went through this, you heard the whole discussion, and wear would favor your side and not. And it's my understanding that our case law supports the idea that when you have multiple plain meanings, you look to the one and choose the one that's most consistent with the spec. I will tell you, in every single embodiment of this specification, the anchor is inserted through the soft tissue at the time of insertion. Not later on, but at the time. So why wouldn't that support adopting the plain meaning of during which for the wear-in clause, which would favor the non-infringement position, argue? Because those examples, Your Honor, first of all, Judge Moore, you pointed out that those examples are talking about going through the soft tissue. And we don't debate that going through the soft tissue is an option and it is a preferred embodiment. But the patent does discuss options or techniques and constructs that have been repaired where it doesn't specify that the anchor has gone through the soft tissue. It's positional, Your Honor. Which one? Show me the embodiment. Column 3, joining column 4, Your Honor. And it says, the use of multiple bone anchors, starting at line 64, increases the footprint over which the suture material presses the soft tissue against the bone. So it's telling you the reason for this positioning. One non-limiting example, depicted in figure 2, includes two bone anchors, one anchor 20 is positioned in a medial location underneath the soft tissue and a second anchor is positioned lateral to the soft tissue 12. The suture is attached to both anchors. So it's the positioning of the anchors that allows the compression of this area of soft tissue. That's not discussing the preferred embodiment of going through the soft tissue. What's depicted in figure 2 are generic anchors, not a preferred embodiment of the tissue piercing anchor. It goes on, on column 4. It says, in one embodiment, the suture 10 is attached to the medial bone anchor prior to insertion of the medial bone anchor 20. So that's in one embodiment. And it says, thus in this embodiment, the surgeon does not need to pass the suture through the soft tissue. So in this embodiment, so it's suggesting that that's not the entire invention, that the invention does not contemplate that the anchor must go through the soft tissue. We know from the prior art that it was known that you could put an anchor directly into the bone or you could put an anchor through the soft tissue. That's at A14552. I'm sorry, does thus in this embodiment, you want me to give it what meaning? That it's going on and it says, in one embodiment, the suture is attached to the medial bone anchor prior to insertion of the medial bone anchor. But this has to do with the suture and when it's attached. It doesn't have anything to do with the anchor going through or not going through the tissue, right? Am I missing something? I guess I'm not understanding the import you want me to draw from this sentence. Because I don't see that it has anything to do with the anchor going through the tissue. It has to do with the suture being attached to the anchor. Well, if the suture is not attached to the anchor, certainly there's no impetus to put it through the soft tissue. Because if you have no suture attached and you put it through the soft tissue, all you've done is put a hole through the soft tissue, loose soft tissue by definition, the anchor into bone, and then you have to go back to that anchor that's under the soft tissue and attach a suture to it. And another point, Your Honour, with respect to whether it's temporal or positional, by definition we're attaching soft tissue that's been loosened from the bone, so it's detached from the bone. And granted, the patent does specify a preferred embodiment, a preferred embodiment that is explicitly claimed, independent, claim-free, wherein it goes through the soft tissue, that that is a preferred embodiment. Well, but whether correct or not in this record doesn't give me facts to make me expert enough in this medical procedure to know, Mrs. Woodworth suggests that you could lift the tissue up, insert it directly beneath the tissue during insertions beneath the tissue without actually puncturing the tissue. As best as I can tell, there's no record evidence to suggest this is the way it's done, this is not the way it's done, and I certainly don't have enough expertise to ascertain. But at a minimum, as a question of law, that would then not implicate problem vis-à-vis claim differentiation because Claim 1 would continue to have a broader meaning than Claim 3 under that circumstance and be arguably distinguishable. So, do you want to respond to that? Well, yes, first of all, nothing in the patent suggests their significance to this temporal aspect. The patent does suggest... Well, it's just that it says through the soft tissue something like 17 times. And in every embodiment, not just one embodiment, not just the one preferred embodiment, it keeps saying in one embodiment, in one embodiment, in one embodiment, as though there are 17 different embodiments disclosed, but in every one of them it seems to go through the soft tissue expressly. And so I've got two plain meanings, and I'm trying to figure out which one to adopt, and you're saying the general language that says bottom of column 3 and the top of column 4, which doesn't say through the soft tissue but also is in sort of in detail the way all the other embodiments are, is enough to warrant giving you the broader of the two plain meanings? Yes, that the invention certainly contemplated something that was one... How do we know it contemplated it? It certainly doesn't expressly say that there's any method of doing this other than through the soft tissue. Well, one, we know that that was known. That's known in the prior art. The patent does specify the position without specifying it going through the soft tissue, where I read from column 3. It also does the same in the methods section of column 14. It discusses the positioning, not the temporal aspect, it discusses the positioning of the anchors, and also in the prosecution history at 11-298. Well, I'm a little confused when you say column 14, the positioning, but here it says in an alternative embodiment the first anchor is positioned laterally to the soft tissue. I don't think that embodiment is covered by claim 1, is it? I mean, that seems it's a three-anchor system with... Is that the line that you're referring to, or is there a different line in column 14? I'm sorry. Starting at line 3, in another embodiment, multiple lengths of suture are attached to multiple anchors. In one embodiment, at least three anchors are inserted into bone. A first length of suture may be secured between a first and second anchor, and a second length of suture may be secured between the first and third anchor. In one embodiment, the first anchor is positioned beneath the soft tissue, and the second and third anchors are positioned laterally to the soft tissue. In an alternative, it discusses the opposite of that, but it's discussing the positioning of those anchors without specifying a temporal aspect. The positioning is important, as I was going to point to in the prosecution history. At 11298, the applicant is explaining the distinction of their invention versus the prior art. It did not provide such positioning to compress... and mentions that a careful review of the figures of Thal shows anchors positioned only along the tissue edge, not positioning an anchor such that it does not extend beyond the edge of the soft tissue. Job also does not teach an anchor underneath the soft tissue. I'm sorry, where are you reading from? You said 11298? I apologize, Your Honor. 11299 is where I read from. I'm sorry. I'm just trying to catch up to you. So at the top of 11299, it's referring to the Thal 168 patent, and anchors positioned only along the tissue edge, not positioning an anchor such that it does not extend beyond the edge of the soft tissue. So again, that's positional, not temporal. For the Thal, nor Job teach detention suture, and that's the other limitation in the claims. That positioning is also mentioned on 11298 in the sections there under rejections under section 103. And finally, there is a point that Dr. Ticker explained. And again, this is an issue that was raised by Arthrex on summary judgment, a motion for summary judgment which was denied. The judge rejected their claim construction that the anchor must be inserted through the soft tissue, and then there was a trial, and the jury was instructed to apply the plain and ordinary meaning, and there was infringement found. In that summary judgment that was rejected by the district court, Dr. Ticker's deposition was submitted, and he explained that in his interpretation, certain figures of the patent show an anchor that must have been inserted into the bone first, because the two suture limbs that come from that anchor come out separate holes. So if that anchor would have gone through the soft tissue, the anchors necessarily, or the sutures necessarily, would come through a single hole. And that was at A306567. What figure? Are you talking about figure 3? Figure 3C. I don't know about you, but are you looking at figure 3C? It's kind of hard for me to tell whether it's one hole, two holes. I mean, I sure as heck can't tell from that figure anything at all. I mean, look at it. Do you see dotted lines, solid lines, such that you believe that there's a single hole, two holes? Well, they're coming out of Dr. Ticker's testimony. They're coming out of two different locations, and this is showing a... Well, that's because they're attached to two different portions of the anchor, but I don't... I have to be honest, I didn't read that portion of Dr. Ticker's testimony, but I don't see how this figure... And this figure is also showing generic anchors, not the tissue-piercing anchors of the preferred embodiment. I see my time is up, unless there's any further questions. Any more questions for Mr. Jennings? Thank you, Mrs. Jennings. Mr. Brewster, your story is about time. Thank you, Your Honor, and just a couple of quick points in response. In response to Judge Moore's questions, I note that Mr. Jennings was able to point to general descriptions of where the anchors are located with respect to the tissue, but not a single one of those examples uses the key phrase, which is inserting. Not a single one of the examples where it generically describes where the anchors are located uses the word inserting. Every time, as Judge Moore pointed out, that the word inserting of the medial anchor is described in this patent, is described in only one way, and that's going through the tissue and ending up... Your Honor, I thought your argument was that it didn't have to go through the tissue. I don't think... I mean, it seems to me that you'd have a much stronger argument if you were saying, wherein it's kind of ambiguous here, but the specification, every single one says it goes through the tissue, and that's what it should be. But you said, well, it doesn't have to go through the tissue. It just, at the time it's inserted, the tissue has to be hovering above it. We're not saying that the tissue has to be hovering above it. We're not saying anything about how you get it underneath the tissue. What we are saying is the plain language of this claim... But how do you get it under the tissue if you don't go through it? I think the most likely thing is that you do go through it, and that's exactly what they teach. That's all that they teach. Wait, so is your position then that it has to be inserted through the tissue? That's what the meaning of this claim is? My, no, my position is that it has to be inserted so that it's underneath the tissue. So, what possible way could it be inserted underneath the tissue at the time of the insertion of the anchor unless it goes through the tissue? Judge Moore's correct. There's not much record evidence of that, but I gave you the one example. The hovering above it. The hovering above it, correct. But if the court wants to... Well, I mean, I want to ask you about that because what does that mean? How far, you know, that seems kind of really a very odd thing to say that if it's at this angle and you put it in, you're under it. If it's at this angle, you might be. If it's at this angle, you're no longer. I mean, do you think really that that's what they were claiming to mean? That if it's at this angle, you're doing it underneath, but if it's at a 90-degree angle and standing straight up, it's not underneath? If you want to know what I think the inventors mean, I think the record's clear that what they invented was going through the tissue. I agree with you on that point. That's certainly what most of the specification shows, but the language doesn't necessarily say that. That's right, and so we're trying to reflect in our construction that there are possibilities that could be encompassed within... That's what I think you're trying to do is not make the really strong... I won't characterize the argument that it has to go through the skin. It's more restrictive. More restrictive, right, because you realize that there's a claim differentiation problem if you make that argument. There could be. I realize that there could be, but I also realize that Phillips tells us that the spec is the best example, and all of the rest of the... I just find it hard to think of any way, if this has to be under the skin at the time of the insertion, that there's any practical way of doing that without putting it through the tissue. Well, we would obviously have no problem if the court chose to construe it as going through the tissue, but I'll say that in terms of our construction or that hypothetical that I gave you being unreasonable, I think it's actually significantly more reasonable than their construction, which requires the position being... This is at page 35 of their red brief. Their position is that it's the portion of the bone which ordinarily lies underneath the soft tissue and which lies underneath this tissue when the repair is complete. So to us, again, if there's anyone adding a temporal limitation that it's not there, it's KFX. They're suggesting that the correct time is when the repair is complete. There's nothing within the context of the claim, the specification, the intrinsic record that would support that. Again, just to reiterate that the prosecution history at 11-1264 describing this claim, what was Claim 91 during the application, now Claim 1, says that this claim is inserting the first anchor underneath the tissue, and that's exactly how Arthrex asks you to construe. And when that's done, there's no evidence to support the finding of infringement. Just very, very quickly with respect to obviousness. Well, I think we've exhausted your time. Is there anything new that you haven't already told us? I guess just with respect to Arthrex going the wrong way, which was Mr. Jennings' argument, and that that being something that supports... That hasn't been told us. Okay. That is found in our briefs, and we urge the court to read those and respectfully request that the court reverse the judgment. Thank you. Thank you. Thank you both. The case is taken at this submission. All rise.